UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  15-62728-Civ-Zloch/Hunt

GARY KOLLIN,

       Plaintiff,

  v.

JASON DORSETT, individually, and
and SCOTT J. ISRAEL, as SHERIFF of
BROWARD COUNTY, Florida,

       Defendants.

_____/

## PLAINTIFF, GARY KOLLIN'S, MOTION FOR PARTIAL SUMMARY JUDGMENT

**COMES NOW** the Plaintiff, GARY KOLLIN  (hereinafter "Kollin"), by and through his undersigned attorneys, and pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, hereby submits this Motion for Partial Summary Judgment, and in support thereof, states the following:

1.      This is a civil action under 42 U.S.C. § 1983 and Florida law against JASON DORSETT, individually (hereinafter "Dorsett" or "Jason Dorsett"), and SCOTT J. ISRAEL, as SHERIFF of BROWARD COUNTY, Florida (hereinafter "Broward Sheriff's Office").

2.      Kollin's complaint includes four claims.  Count I seeks relief under 42 U.S.C. §1983 against Jason Dorsett, individually, for First Amendment Retaliation.

3.      Count II seeks relief against Jason Dorsett, individually, for unlawful seizure under the Fourth Amendment and 42 U.S.C. § 1983.

4.      Count III seeks relief against the Broward Sheriff's Office for false arrest/false imprisonment under the laws of the state of Florida.

5.      Count IV seeks relief in the alternative against Jason Dorsett, individually, for false arrest/false imprisonment under Florida law.

6.      With regards to Kollin's false arrest/false imprisonment claim under 42 U.S.C. § 1983 (Count II), the Motion for Partial Summary Judgment is limited only to the questions of whether Kollin's seizure was unconstitutional and violated clearly established law (i.e., the defense of

qualified immunity).

7.       As for Kollin's claims for false imprisonment under Florida law (Counts III-IV), the Motion for Partial Summary Judgment is limited to question of whether Kollin's arrest or temporary detention or was supported by probable cause or reasonable suspicion.  (Under Florida law, probable cause is an affirmative defense and not an element of a claim for false arrest/false imprisonment).[1]

## MEMORANDUM OF LAW

**1.      Summary judgment pursuant to Fed. R. Civ. P. 56:**

Pursuant to Fed. R. Civ. P. 56, a party may move for summary judgment or partial summary judgment as to any claim or defense, or part of any claim or defense.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

**a).      When the moving party has the burden of proof at trial**

The Rule 56 standard is altered when the party seeking summary judgment also has the burden of proof at trial.

> When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." Id. at 331, 106 S.Ct. at 2557 (Brennan, J., dissenting); *see also* Chanel, Inc., 931 F.2d at 1477.  In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party.  *See* id. at 1477. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, "come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." Id.; *see also* Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 331, 106 S.Ct. at 2557 (Brennan, J., dissenting).

---

[1]

In a false arrest action under Florida law,  the defendant must establish the presence of probable cause.  Lee v. Geiger, 419 So. 2d 717, 719 (Fla. 1st DCA 1982).  Thus, probable cause is an affirmative defense which must be plead and proven by the defendant.  Mailly v. Jenne, 867 So.2d 1250 (Fla. 4th DCA 2004) ("Probable cause is an affirmative defense to a false arrest claim") (italics added); Miller v. City of Jacksonville, 603 So.2d 1310, 1312 (Fla. 1st DCA 1992) (Probable cause is an affirmative defense to a claim of false arrest or false imprisonment . . . and, therefore, the burden is upon the defendant to establish the existence of probable cause in order to successfully assert this defense"); Florida Game and Freshwater Fish Commission v. Dockery, 676 So.2d 471, 474 (Fla. 1st DCA 1996) (same); City of St. Petersburg v. Austrino, 898 So.2d 955, 957 (Fla. 2nd DCA 2005) (same); Daniel v. Village of Royal Palm Beach, 889 So.2d 988, 989 (Fla. 4th DCA 2004) (same).

United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in State of Alabama., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (quotation marks and alterations omitted).

**2.      The defense of qualified immunity**

Qualified immunity protects government officials performing "discretionary functions" from civil liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[2] Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982). The qualified immunity inquiry "turns on the 'objective legal reasonableness' of the [official's] action, assessed in light of the legal rules that were 'clearly established' at the time" of the conduct. Wilson v. Layne, 119 S.Ct. 1692, 1699 (1999) (quoting Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738-39 (1982)). In 1997, the United States Supreme Court described these principles for the first time as the "fair warning" requirement. United States v. Lanier, 117 S.Ct. 1219, 1225 (1997).

Under the "fair warning" requirement, liability may be imposed under 42 U.S.C. §1983 "for the deprivation of a constitutional right if, but only if, 'in the light of preexisting law the unlawfulness [under the Constitution is] apparent.'" United States v. Lanier, 117 S.Ct. 1219, 1228 (1997) (quoting Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987)). "Where it is, the constitutional requirement of fair warning is satisfied." United States v. Lanier, 117 S.Ct. at 1228.

In United States v. Lanier, Justice Souter analyzed the fair warning requirement in 18 U.S.C. §242, the criminal law counterpart to 42 U.S.C. §1983. Justice Souter explained that United States Supreme Court's decisions "upheld [criminal] convictions under §241 or §242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decision gave *reasonable* warning that the conduct then at issue violated constitutional rights." Id. at 1227 (italics added). Justice Souter also found no difference between the "qualified immunity" standard applicable in civil actions under 42 U.S.C. §1983 and the fair warning requirement applied in criminal cases under 18 U.S.C. §242. "[B]oth [statutes] serve the same objective, and in effect, the qualified immunity test is simply the adaptation of the fair warning

---

[2]

Dorsett is entitled to raise the defense of qualified immunity since he was working as a deputy sheriff for the Broward Sheriff's Office and performing "discretionary functions" at the time of the incident. Grider v. City of Auburn, Ala., 618 F.3d 1240, 1262 n.33 (11th Cir. 2010) ("[I]n qualified-immunity cases, we examine whether a public official's acts fall within 'his scope of authority' and thus his 'discretionary functions,' not whether he was authorized to commit an illegal act") (citing O'Rourke v. Hayes, 378 F.3d 1201, 1205-06 (11th Cir. 2004)).

standard." <u>Id</u>. at 1227.  The Court concluded:

> This is not to say, of course, that the single warning standard points to a single level of specificity in every instance.  In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful." As Judge Daughtrey noted in her dissenting opinion in this case, "'[t]he easiest cases don't even arise.   There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.'"

<u>United States v. Lanier</u>, 117 S.Ct. at 1227-1228 (internal citations omitted).

### a).    Qualified immunity post-*Lanier*

In the aftermath of the United States Supreme Court's opinion in <u>Lanier</u>, some decisions interpreted <u>Lanier</u> narrowly.  Other courts took a more expansive view.  Any confusion ended with the United States Supreme Court's subsequent decision in <u>Hope v. Pelzer</u>, 122 S.Ct. 2508 (2002).

In <u>Hope v. Pelzer</u>, the United States Supreme Court reversed the Eleventh Circuit's finding that qualified immunity protected correctional officers at Alabama's Limestone Prison who "twice handcuffed [Larry Hope] to a hitching post to sanction him for disruptive conduct." <u>Id</u>. at 2512.  The Eleventh Circuit granted the officers qualified immunity, since there were no "earlier cases with 'materially similar' facts." <u>Id</u>.  The United States Supreme Court reversed, concluding:

> Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances.   Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar."  Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.   The same is true of cases with "materially similar" facts.  Accordingly, pursuant to *Lanier*, the salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

<u>Hope v. Pelzer</u>, 122 S.Ct. at 2516.

Following <u>Hope v. Pelzer</u>, a majority of the Eleventh Circuit's then-active members joined panel decisions warning against an "unduly rigid" qualified immunity framework (also referred to

as a "rigid gloss").[3]  For example, in <u>Holloman ex. Rel. Holloman v. Harland</u>, 370 F.3d 1252 (11th

Cir. 2004), Judge Tjoflat observed that

> [t]his circuit was recently chastised by the Supreme Court for taking an
> unwarrantedly narrow view of the circumstances in which public officials can be held
> responsible for their constitutional violations. . . .The law of this circuit used to be
> that a government actor could be denied qualified immunity only for acts that are "so
> obviously wrong, in light of the pre-existing law, that only a plainly incompetent
> officer or one who was knowingly violating the law would have done such a thing."
> <u>Lassiter v. Ala. A & M Univ., Bd. of Trustees</u>, 28 F.3d 1146, 1149 (11th Cir. 1994)
> (en banc).  The Supreme Court, specifically citing <i>Lassiter</i> (along with a handful of
> other Eleventh Circuit cases), held that "[t]his rigid gloss in the qualified immunity
> standard . . . is not consistent with [the Supreme Court's] cases." <u>Hope v. Pelzer</u>, 536
> U.S. 730, 739 & n.9, 122 S.Ct. 2508, 2515 & n.9, 153 L.Ed 2d 666 (2002).

<u>Holloman ex. Rel. Holloman v. Harland</u>, 370 F.3d 1252, 1277 (11th Cir. 2004).

The decision in <u>Holloman</u> and other post-<u>Hope</u> qualified immunity cases signaled a new era

in the Eleventh Circuit.  <u>Lassiter</u> is no longer good law, and "[q]ualified immunity is, as the term

implies, qualified.  It is not absolute.  It contemplates instances in which public official's actions are

not protected." <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1233 (11th Cir. 2004).

These principles apply even in the absence of case law with "materially similar" facts.  As

the Eleventh Circuit explained in <u>Amnesty International, USA, v. Battle</u>, 559 F.3d 1170 (11th Cir.

2009):

> All of the caselaw cited . . . [by Amnesty International, USA], with the exception of
> <u>Citizens for Peace in Space</u>, is good authority that predates the November 20, 2003
> incident.  <u>Saia</u>, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); <u>Warner Cable
> Commc'ns</u>, 911 F.2d 634 (11th Cir.1990); <u>Ward</u>, 491 U.S. 781, 109 S.Ct. 2746
> (1989).[FN9]  None of these cases, however, are on all fours with the instant case, and
> do not clearly elucidate the fact-specific rule that police may not create a police
> cordon that makes a protest rally totally ineffective.  Prior cases clearly establishing
> the constitutional violation, however, need not be "materially similar" to the present
> circumstances so long as the right is "sufficiently clear that a reasonable official
> would understand that what he is doing violates that right." <u>Hope v. Pelzer</u>, 536 U.S.
> 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).  There need not, however, be a
> prior case wherein "the very action in question has previously been held unlawful."

---

<i>See</i>, <u>Akins v. Fulton County, GA</u>, 420 F.3d 1293, 1307 (11th Cir. 2005); <u>Holloman ex. Rel.
Holloman v. Harland</u>, 370 F.3d 1252, 1277 (11th Cir. 2004); <u>Grayden v. Rhodes</u>, 345 F.3d 1225,
1231-32 (11th Cir. 2003); <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1332 (11th Cir. 2003); <u>Willingham v.
Loughnan</u>, 321 F.3d 1299 (11th Cir. 2003).

Id. at 741, 122 S.Ct. 2508 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034). Here, Defendants had fair warning that Amnesty had a clearly established right to assemble, to protest, and to be heard while doing so.

**FN9**   Although the discussion of the rights at issue may have been put in general terms in the cited cases, this generality does not deprive these cases of their ability to "clearly establish" the violation of Amnesty's constitutional rights.  Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning ....").

Amnesty International, USA, v. Battle, 559 F.3d at 1185 & n.9 (11ᵗʰ Cir. 2009).

> **b).**     **The so-called *arguable* probable cause standard**

Although the term *arguable* probable cause appears in the majority of Eleventh Circuit decisions in which the defense of qualified immunity is discussed, the United States Supreme Court has never used the phrase *arguable* probable cause. The omission is not an oversight, since there is no functional distinction between the definitions of probable cause and *arguable* probable cause.

The phase *arguable* probable cause first appeared in the Eleventh Circuit in Von Stein v. Brescher, 904 F.2d 572, 579 (11ᵗʰ Cir. 1990), where the Eleventh Circuit explained that when the defense of qualified immunity is raised in false arrest claims under 42 U.S.C. §1983, the issue is

> not probable cause in fact, but arguable probable cause.  Actual probable cause is not necessary for an arrest to be objectively reasonable.  Indeed, it is inevitable that law enforcement officials will in some cases reasonably but *mistakenly* conclude that probable cause is present, and in such cases those officials should not be held personally liable.

Von Stein, 904 F.2d at 579 (citations, internal ellipses, and internal quotations omitted) (italics added).

Without ever using the term *arguable* probable cause, the United States Supreme Court has long recognized in qualified immunity cases "that it is inevitable that law enforcement officials will in some cases reasonably but *mistakenly* conclude that probable cause is present, and . . . in such cases those officials– like other officials who act in ways they reasonably believe to be lawful– should not be held personally liable."  Anderson v. Creighton, 107 S.Ct. 3034, 3039-40 (1987) (italics added).  The result is the same under the Fourth Amendment.  Heien v. North Carolina, 135 S.Ct. 530, 539 (2014) ("The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable.");  Brinegar v. U.S., 69 S.Ct. 1302, 1311 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some *mistakes* on their part.  But the

*mistakes* must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability").

Because the probable cause and *arguable* probable cause standards both allow for reasonable mistakes, the continued validity of the *arguable* probable cause standard has been called into question. Following the Eleventh Circuit's decision in Poulakis v. Rogers, 341 Fed.Appx. 523, 526–27 (11th Cir. 2009) (unpublished), the view adopted by the majority of trial courts is that "'[a]rguable probable cause'" is merely the label the Eleventh Circuit uses for the 'clearly established' inquiry in wrongful arrest cases." Dunn v. City of Boynton Beach, – F.Supp.3d – , 2016 WL 3256935 at *7 (S.D. Fla. June 14, 2016) (citing Poulakis v. Rogers, 341 Fed.Appx. at 526–27); Towns v. Beseler, WL 5933400, at *6 (M.D. Fla. Oct. 12, 2016) (same); Cohen v. McGuire, 2016 WL 3188889, at *10 (M.D. Fla. June 8, 2016) (same); Parks v. City of Birmingham, Ala., 2015 WL 1487152, at *6 (N.D. Ala. Mar. 30, 2015) (same); Meyer v. Franklin, 2016 WL 944421, at *6 (N.D. Fla. Feb. 25, 2016) (same), report and recommendation adopted, 2016 WL 953851 (N.D. Fla. Mar. 11, 2016); Dixon v. City of Selma, 2011 WL 2681474, at *9 (S.D. Ala. July 11, 2011) (same).

As Judge Hoeveler observed in Fils v. City of Aventura, 768 F.Supp. 2d 1188, 1202 (S.D. Fla. 2010), *aff'd in part and rev'd in part on other grounds*, 647 F.3d 1272 (11th Cir. 2011),

> in Poulakis v. Rogers, the majority of the Eleventh Circuit panel commented extensively on the placement of the arguable probable cause inquiry, seeming to reject the Davis and Skop approach. *See* Poulakis, 341 Fed. Appx. at 527 n. 2. Rather, Poulakis instructs that the first step of Saucier is concerned only with whether the arresting officer had real probable cause to make the arrest. Id. at 525–27. If he did, qualified immunity applies. If he did not, the court reaches Saucier step two to decide whether the illegal arrest was nevertheless excusable because the officer had "arguable probable cause"— ***i.e., because no pre-existing law clearly put the arresting officer on notice that his conduct was unconstitutional***. Id. at 527; Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present").

Id. (bold added).

As former Second Circuit Judge Sonya Sotomayor noted in Walczyk v. Rio, 496 F.3d 139, 168 (2nd Cir. 2007) (Sotomayor, J., concurring):

> [R]easonableness-and therefore the existence of "arguable probable cause"-are considerations that **properly fall *within* the clearly established inquiry as the Supreme Court has described it.** *See* Anderson, 483 U.S. at 640-41, 107 S.Ct. 3034; Brosseau, 543 U.S. at 199-201, 125 S.Ct. 596. It is not surprising, then, that

"arguable probable cause" finds no mention in any Supreme Court opinion; the need for a separate term to describe this concept arises only once we have improperly splintered the "clearly established" inquiry. Because I believe "arguable probable cause" is both imprecise and an outgrowth of the first flaw in our qualified immunity analysis, I do not agree with the majority's use of the term.

Id. at 168 (italics in original) (bold added).

**3.     Kollin was subjected to false arrest/false imprisonment under Florida law**

Kollin was arrested by Dorsett for obstruction of justice after refusing to confine himself inside the residence of his ex-fiancé, Dory Meyer.   Florida statute § 843.02 provides:

> Resisting officer without violence to his or her person.--Whoever shall resist, obstruct, or oppose any officer . . . or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

Fla. Stat. § 843.02.  Based on the plain language of § 843.02, its application is limited to situations where an officer is executing legal process, "or in the lawful execution of a legal duty."  Id.

In the 1970-80's, constitutional challenges arose to obstruction statutes across the United States, including Florida.  In City of Houston Tex. v. Hill, 107 S.Ct. 2502 (1987), the United States Supreme Court reviewed the constitutionality of a Houston ordinance making it "unlawful for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty . . . ."  Id. at 2506.  Raymond Hill was a paralegal and political activist.  Id. at 2505.  Hill observed a friend standing in the roadway and holding up traffic (so a motorist could safely back their vehicle into the street).  When two police officers approached Hill's friend, he intentionally attempted to divert the officers' attention by shouting and interrupting them.  Hill was arrested.  In finding the Houston ordinance unconstitutionally overbroad, the United States Supreme Court observed that it has "repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."  Id. at 2511.

Following City of Houston Tex. v. Hill, constitutional challenges were made against Florida Statute § 843.02.  In Goffin v. State, 560 So. 2d 421 (Fla. 4th DCA 1990), Florida's Fourth District Court of Appeals distinguished City of Houston v. Hill on the basis that "the enforceable portion of the challenged Houston ordinance dealt exclusively with speech, whereas section 843.02, Florida Statutes (1987), encompasses both speech and conduct."  Id. at 422.  Thus, Goffin's constitutional challenge failed, since it was his physical conduct and not protected speech that obstructed the

police.  Id. at 422.

Similarly, in Wilkerson v. State, 556 So. 2d 453 (Fla. 1ˢᵗ DCA 1990), Florida's First District Court of Appeal reviewed a constitutional challenge to § 843.02.  In finding the statute constitutional, the Court in Wilkerson agreed with the reasoning in Goffin, holding that § 843.02 did not implicate protected speech, and instead, "proscribe[d] only acts or conduct that operate to physically oppose an officer in the performance of lawful duties."  Id. at 455-56.   The Court concluded:

> We do not construe the language of section 843.02 as reaching protected free speech. The statute uses only two operative words, i.e., "obstruct or oppose" an officer. The word "obstruct" means "to interfere with, impede, or retard," American Heritage Dictionary of the English Language, p. 907 (1979 ed.), and in this sense contemplates acts or conduct apart from verbal expressions, which operate to physically hinder or impede another in doing something.  The word "oppose" has a broader definition, i.e., (1) "To be in contention or conflict with; combat; resist: oppose the enemy force "; and (2) "To be against; be hostile to: oppose new ideas." Id. at 922.  Thus, the word "oppose" can be used to connote either (1) conduct or acts of physical resistance and opposition, or (2) verbal expression of conflicting or differing ideas; but obviously its use in the first sense does not connote the second sense.  We have no doubt that the use of "oppose" in conjunction with "obstruct" manifests a clear and unambiguous legislative intent to proscribe only acts or conduct that operate to **physically** oppose an officer in the performance of **lawful duties**.  Thus, we agree with the state's argument that this statute may be given a limiting construction that avoids the overbreadth deficiency found in the Houston ordinance by the Court in Hill.

Wilkerson v. State, 556 So. 2d at 455–56 (bold added).

In 1995, in response to the overbreadth concerns highlighted in City of Houston v. Hill, the Florida Supreme Court modified the last paragraph of the standard jury instruction for § 843.02 by including the following signal:

| Note to Judge: | In giving this instruction, refer only to the type of duty or legal process that was being performed, e.g., making an arrest, serving a subpoena, serving a domestic violence order.  See *Hierro v. State*, 608 So. 2d 912 (Fla. 3rd DCA 1992). |

Standard Jury Instructions in Criminal Cases (95-1), 657 So. 2d 1152, 1156 (Fla. 1995).

Florida's Fourth District Court of Appeal subsequently decided Jay v. State, 731 So. 2d 774 (Fla. 4ᵗʰ DCA 1999). Jay was accused of interfering with an undercover police prostitution investigation by verbally informing two females, including a known prostitute: "'[D]on't get in the

car, he's a cop.'" <u>Jay v. State</u>, 731 So. 2d 774 (Fla. 4th DCA 1999).  Jay then ran away on foot but was apprehended nearby.

In concluding that the police officers involved in the undercover prostitution investigation in <u>Jay</u> were *not* engaged in a "legal duty" within the meaning of § 843.02 (and therefore, Jay's arrest was unlawful), the court noted that "'[i]t is important to distinguish between a police officer in the lawful execution of any legal duty and a police officer who is merely on the job.'" <u>Id</u>. at 775 (*quoting* <u>D.G. v. State</u>, 661 So.2d 75, 76 (Fla. 2nd DCA 1995)).   In other words, consistent with the modifications to the Florida Standard Jury Instructions, the "legal duty"element is not satisfied unless an officer is serving process, making an arrest (or conducting a temporary detention), or requesting "assistance in an ongoing emergency that presents a serious threat of imminent harm to person or property."  <u>D.G. v. State</u>, 661 So. 2d 75, 76 (Fla. 2d DCA 1995).

Four years after <u>Jay v. State</u>, the Eleventh Circuit decided <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307 (11th Cir. 2003).  The decision in <u>Storck</u> codified the principle that a police officer who is merely on the job is not engaged in the lawful execution of a "legal duty" for purpose of § 843.02.   The Court in <u>Storck</u> observed:

> On the question of whether an officer was performing a legal duty for purposes of a conviction under § 843.02 "'it is important to distinguish between a police officer in the lawful execution of any legal duty and a police officer who is merely on the job.'" <u>Jay</u>, 731 So.2d at 775 (internal citation omitted) (*quoting* <u>D.G. v. State</u>, 661 So.2d 75, 76 (Fla.Dist.Ct.App.1995)). Job functions that qualify as falling within the ambit of "the lawful execution of any legal duty" under Florida law include an officer's (1) serving process, (2) legally detaining a person, and (3) asking a person for assistance with an ongoing emergency. *See* <u>Jay</u>, 731 So.2d at 775; <u>D.G.</u>, 661 So.2d at 76.

<u>Storck v. City of Coral Springs</u>, 354 F.3d at 1315.

Following <u>Storck</u>, the Eleventh Circuit decided <u>Davis v. Williams</u>, 451 F.3d 759 (11th Cir. 2006).  Davis was charged with obstruction of justice and disorderly conduct under Florida law for interfering with a traffic stop by approaching the officers and verbally interrupting them.  The Eleventh Circuit reversed the district court's order granting summary judgment, holding: "Florida courts have generally held, with very limited exceptions, that **physical** conduct must accompany offensive words to support a conviction under § 843.02." <u>Davis v. Williams</u>,  451 F.3d 759, 765 (11th Cir. 2006) (bold added).

In concluding that the officer in <u>Davis</u> violated clearly established law, the Eleventh Circuit

relied on decisions from Florida's intermediate appellate courts, including J.G.D. v. State, 724 So.2d

711 (Fla. 3rd DCA 1999).  The Eleventh Circuit noted that J.G.D.

> held that no probable cause for arrest for obstruction existed despite a police order
> directing the defendant to leave an apartment complex, despite the defendant's "loud
> and profane" protests, and despite the gathering of an "unruly crowd." Id. at 711.
> The court ruled that the defendant's words were insufficient to justify any
> wrongdoing, or to amount to a **physical** obstruction of the officers.

Davis v. Williams, 451 F.3d at 765 (bold added).[4]

Florida's Second District Court of Appeals subsequently decided D.A.W. v. State, 945 So.2d

624 (Fla. 2nd DCA 2006).  In D.A.W., City of Tampa police officers initially responded to a

residential neighborhood to investigate a robbery in which "a group of teenagers had taken a bicycle

from another teenager."  D.A.W. v. State, 945 So.2d at 625.  Subsequently, the officers were

dispatched back to a fight between twenty to thirty persons at the same location as the robbery.  Id.

Upon their arrival, children were fighting in the street.  A youth "wielding a beer bottle as

a weapon" was arrested.  Id.  During the arrest process, D.A.W. "stood at a distance of fifteen to

thirty feet away and 'harassed' the person in custody, 'making threats' and 'antagonizing' the youth.

The officer told D.A.W. and his friend to leave more than three times, but they did not."  Id. at 625.

Against this backdrop, the Second District Court of Appeals noted that

> [t]he trial court assumed that if the police officer was arresting the other juvenile
> while D.A.W. was engaging in harassment, that the arrest situation automatically
> permitted this charge [against D.A.W.].  The language in D.G., however, was
> intended to distinguish between a person who was alleged to have opposed or
> obstructed an officer when the officer's conduct was directed to that person.  That is,
> when the officer is not executing process on that person, legally detaining "that

---

4

Florida's Third District Court of Appeals noted that J.G.D. was under no obligation to obey
an unlawful order.  Because J.G.D. was visiting a tenant, he had a legal right to be at the apartment
complex.  As a result, "the order to leave and . . . the arrest for failure to obey that order were each
unlawful. . . ."  J.G.D. v. State, 724 So.2d 711, 712 (Fla. 3rd DCA 1999).

These same principles apply to Kollin, who was at the apartment complex as a guest of Dory
Meyer.  Cf., Reese v. Herbert, 527 F.3d 1253 (11th Cir. 2008) (" Though Reese may have refused to
obey Herbert's order to leave the scene by attempting to approach Trooper Geddie, arrest for
obstruction cannot be predicated upon such a refusal to obey a command to clear the general area
entirely beyond the zone of police operation, which, in the circumstances described, was clearly an
overly broad and unreasonable demand that exceeded reasonable law enforcement procedure and
needs.  Id. at 1273 (internal quotations omitted).

person," or has not asked that person for assistance in an ongoing emergency, then "that person's" actions must normally be physically obstructive, not merely verbally harassing, in order to support a conviction for obstructing an officer without violence . . . . A person's exercise of free speech, without more, in an open public place while an officer is engaged in the execution of a legal duty must do more than merely irritate, annoy, or distract the officer to constitute a crime.

D.A.W. v. State, 945 So. 2d at 626-27.  For these same reasons, there was simply no basis for Jason Dorsett to temporarily detain or arrest Gary Kollin.

**4.     Dorsett was not engaged in the lawful execution of a "legal duty" and was not _physically_ obstructed by Kollin's words or actions**

According to Dorsett, his "legal duty" at the time of his contact with Kollin "was taking care of the situation that I was called for." **(Dorsett, p. 61).**   However, Dorsett agrees that the matter between the two sisters was a "civil issue" and that deputies "cannot enforce civil law." **(Dorsett, p. 41).**

Dorsett also admits that no person was being detained at the time Kollin exited the apartment, and that Kollin has a legal right to exit the apartment.  **(Dorsett, pp., 54, 133).**

On the other hand, Dorsett testified that there was an ongoing emergency that presented a serious threat of eminent harm to persons or property.   **(Dorsett, pp. 61-62).**  Specifically, "[t]he sister, who I got to agree to leave, kept screaming, yelling, about Mr. Kollin and his demeanor and Mr. Kollin decided to come out and start engaging in that.  It became a situation where I knew that I could not leave the scene until she was gone, let's put it that way." **(Dorsett, p. 62).**

Dorsett believed that if he left the scene the sister would have "destroyed" Kollin's vehicle. **(Dorsett, p. 64).**   Dorsett added: "Who knows what she would have done.  Thrown one of the items through a window, defaced the property by throwing stuff.  Who knows.  **(Dorsett, p. 64).**  However, Dorsett admits that he does not recall any specific threats made by Daryl Meyer towards any person or property.  **(Dorsett, p. 64-65).**  Nor did Dorsett have any information that Daryl Meyer was armed with a dangerous weapon.  Finally, none of the words spoken by Daryl Meyer constituted a serious threat of imminent harm towards Mr. Kollin.  **(Dorsett, pp. 65, 67).**

As for Kollin, Dorsett does not recall what Kollin said to Daryl Meyer, and does not allege that Kollin ever made a serious threat of imminent physical harm towards any person or property. **(Dorsett, pp. 63, 67).**

Kollin never came closer than "[t]wenty feet, give or take." **(Dorsett, p. 68).**  Nothing about

the words spoken by Kollin regarding his offer to consent to a search of his vehicle was said in a manner that Dorsett understood would cause a reasonable person in Daryl Meyer's position to respond with violence to any person.  **(Dorsett, p. 76).**

Because it was a consensual encounter, Dorsett agrees that Kollin had the legal right to ignore Dorsett's request to go back inside.  **(Dorsett, p. 134).**

Kollin moved back to the area by the front door of the apartment.  **(Dorsett, p. 70).**   The front door was an additional 20-30 feet back from the location where Kollin had offered Dorsett permission to search his car.  **(Dorsett, p. 87).**

Kollin was legally on the property because he was an invited guest at Dorianne Meyer's apartment.  "[S]he kept telling him to come inside so he was invited."  **(Dorsett, p. 92).**

All Kollin's speech was directed towards Dorsett, not Daryl Meyer.  **(Dorsett, p. 73).**  Nor did Dorsett have any evidence that Kollin was armed with a dangerous weapon.  **(Dorsett, p. 79).**  Nevertheless, he believed Kollin's physical presence outside the apartment was a safety concern.  **(Dorsett II, p. 37).**

Because Kollin refused to go back inside the apartment Dorsett believed he was mentally unstable or under the influence.  Dorsett explained:  "Normal people do not do that .  When a normal person is told to go inside, they usually do it.  So if they don't, they are either mentally unstable or under the influence of a narcotic or alcohol."  **(Dorsett, p. 82).**

Once Kollin was handcuffed, he was patted down for weapons and placed in the back of Dorsett's police car with the door closed.  **(Dorsett II, pp. 24, 46).**  In total, Kollin was handcuffed about 20 minutes.  **(Dorsett II, p. 40).**

In a document styled "Response to Broward Sheriff's Office Counseling Report," Dorsett denied that Kollin made verbal threats against him and alleged that Kollin was handcuffed "for my safety and the safety of others."  Dorsett described the situation as "neither unusual nor confrontational."  **(Exhibit D).**

For his part, George Wentland testified that no physical or verbal threats were made by anybody inside the apartment, and it was ultimately determined that Daryl Meyer would leave voluntarily.  **(Wentland, pp. 15-16, 19).**

Daryl Meyer was never detained.  She was at all times free to leave, but was advised if she drove off she would get stopped for DUI and could be arrested.  **(Wentland, p. 30).**

Dorsett and Wentland remained on scene to make sure that Daryl Meyer didn't try to drive off in her vehicle before her ride arrived.  **(Exhibit E, pp. 6, 12)**

As Daryl Meyer sat inside her vehicle while waiting for her ride to arrive, Wentland stood right in front of the vehicle.  **(Wentland, pp. 23, 36).**   During what Wentland understood was a consensual encounter, Dorsett "asked [Kollin] to go back in the house."  **(Wentland, pp. 24, 33).**  Kollin never spoke to Daryl Meyer, and never said anything that would cause a reasonable person to respond with violence. **(Wentland, p. 42-43).** Nor did Wentland hear Daryl Meyer say anything from inside the vehicle to either Wentland, Dorsett, or Kollin.   **(Wentland, p. 37).**

Dorsett told Kollin to go back inside the residence "a good three times or even more." **(Exhibit E, pp. 10-11)**.  However, Wentland admits there is no legal basis for a deputy sheriff to confine a person to the inside of a residence.   **(Wentland, p. 29).**

Wentland never observed Kollin "do anything illegal."  **(Wentland, p. 50-51).**  At the time Kollin told Dorsett that he was not going back inside the house, Wentland agrees that Kollin was under no legal obligation to go back inside the residence.   **(Wentland, p. 52-53)**.  When Kollin spoke with Dorsett his voice was elevated but he was not screaming.  **(Wentland, p. 53).**

Although Kollin appeared angry with Dorsett, his words were still protected speech. **(Wentland, p. 55).**  Nevertheless, "to keep the peace, Deputy Dorsett ordered Mr. Kollin back into the house where there would not longer be an issue."  **(Wentland, p. 45).**

When Sgt. Lewis arrived, Wentland admitted to Sgt. Lewis that he "didn't feel Mr. Kollin should be arrested."  **(Wentland, p. 72).**

### a.    There was no emergency sufficient to satisfy the "legal duty" requirement under § 843.02

There is simply no evidentiary support for Dorsett's claim that he was requesting assistance with an ongoing emergency that presented a serious threat of eminent harm to persons or property. **(Dorsett, pp. 61-62).**  The United States Supreme Court has "repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."  City of Houston Tex. v. Hill, 107 S.Ct. 2502, 2511 (1987).  Declaring a situation an "emergency," in the absence of any evidence of an actual police emergency, does not afford Dorsett the right to arrest Kollin for words or conduct that annoy or offend him.

Both Dorsett and Wentland were on scene at all times while Daryl Meyer waited for her ride

to arrive.  During that time, there was simply no *serious* threat of *eminent* harm to Kollin or his property.  For that matter, Dorsett does not  recall Daryl Meyer making any specific threats towards *any* person or property.  **(Dorsett, p. 64-65).**

Even if Dorsett was engaged in a "legal duty" (and he was not), Kollin did nothing to physically interfere with Dorsett.  Under § 843.02, Kollin is not subject to arrest for irritating or annoying Dorsett in the absence of evidence that Kollin's "acts or conduct . . . operate[d] to physically oppose [Dorsett] in the performance of lawful duties."  Wilkerson v. State, 556 So. 2d 453, 455-56 (Fla. 1st DCA 1990).  While Kollin's decision to sit on the bench outside the front door may have been annoying, Kollin remained a significant distance away from Dorsett, Wentland, and Meyer, and never physically obstructed Dorsett from completing his law enforcement functions (e.g., waiting with Wentland for Daryl Meyer's ride to arrive).

 **b.**  **Dorsett's order to Kollin was unlawful**

Kollin had a legal right to ignore Dorsett's unlawful command to subject himself to house arrest or confinement.  We do not live in a police state.  In J.G.D. v. State, J.G.D. was arrested after "fail[ing] to obey a police command that he leave an apartment complex where an unruly crowd had gathered while he was visiting a tenant."  J.G.D. v. State, 724 So.2d 711, 712 (Fla. 3rd DCA 1999). Because J.G.D. had a legal right to be at the apartment complex (since he was visiting a tenant), "the order to leave and . . . the arrest for failure to obey that order were each unlawful. . . ."  Id.  These same principles apply to Kollin, who was at the apartment complex at the invitation of Dory Meyer.

Nor is the *possibility* that Daryl Meyer could act unlawfully towards Kollin's property a sufficient basis for Dorsett to arrest Kollin for refusing to submit to house arrest or confinement. That sort of logic "makes a man a criminal simply because his neighbors have no self-control and cannot refrain from violence."  Ashton v. Kentucky, 86 S.Ct. 1407, 1410 (1966) (quoting Chafee, Free Speech in the United States, 151 (1954)).

In Cohen v. California, 91 S.Ct. 1780 (1971), Cohen was arrested and convicted of disturbing the peace under California statute, for wearing a jacket in a courthouse corridor bearing the words: "Fuck the Draft."  A courtroom deputy sent a note to the presiding judge suggesting that the Court hold Cohen in contempt.   When the Court failed to do so, the deputy arrested Cohen after he exited the courtroom.

In reversing Cohen's conviction, the Supreme Court noted that

[w]e have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen. *There may be some persons about with such lawless and violent proclivities, but that is an insufficient base* upon which to erect . . . a governmental power . . . to force persons . . . into avoiding particular forms of expression. That argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless, the States may more appropriately effectuate that censorship themselves.

Id. at 1787 (italics added); *cf*, <u>Wright v. State of Georgia</u>, 83 S.Ct. 1240, 1246 (1963) ("[T]he possibility of disorder by others cannot justify exclusion of persons from a place if they otherwise have a constitutional right (founded upon the Equal Protection Clause) to be present"); <u>Watson v. Memphis</u>, 83 S.Ct. 1314, 1319-20 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise").

### c.      Dorsett's conduct exceeded the scope of a lawful temporary detention

There was simply no legal basis to stop and frisk Kollin. In <u>Terry v. Ohio</u>, 88 S.Ct. 1868 (1968), the United States Supreme Court held that when "unusual conduct . . . leads [an officer] reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous" the officer may "conduct a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him." <u>Id</u>. at 1884-85.  The problem with Dorsett's conduct is that nothing Kollin did or said was unusual (within the meaning of *Terry*) or criminal under Florida law.

Dorsett described the situation as "neither unusual nor confrontational." **(Exhibit D).**  Nor was Dorsett in the performance of a legal duty.  But even if he was, Kollin never physically obstructed Dorsett or Wentland while they were waiting for Daryl Meyer's ride to arrive.

Nevertheless, Dorsett handcuffed Kollin, conducted a pat-down search, and placed Kollin the back of his police car even after Dorsett knew that Kollin was not armed.   As the Florida Supreme Court explained in <u>Reynolds v. State</u>, 592 So.2d 1082, 1085 (Fla.1992),

[w]e do not suggest that police may routinely handcuff suspects in order to conduct an investigative stop. Whether such action is appropriate depends on whether it is a reasonable response to the demands of the situation. When such restraint is used in the course of an investigative detention, it must be temporary and last no longer than necessary to effectuate the purpose of the stop. The methods employed must be the least intrusive means reasonably available to verify or dispel in a short period of time the officers' suspicions that the suspect may be armed and dangerous [internal

citation omitted].  Absent other threatening circumstances, once the pat-down reveals
the absence of weapons the handcuffs should be removed.

Id. at 1085.

Dorsett's conduct towards Kollin exceeded the scope of a reasonable *Terry*-stop and was
tantamount to an arrest requiring probable cause.  Dorsett was not engaged in any legal duty at the
time Kollin was handcuffed and patted down for weapons.  Nevertheless, Kollin was placed in the
back of a police car– ostensibly out of concern that Daryl Meyer would act unlawfully (by destroying
Kollin's vehicle or property).  Punishing Kollin for the conduct (or threatened conduct) of Daryl
Meyer was unreasonable.

A temporary detention may be used only to confirm or dispel an officer's reasonable
suspicion of criminal activity, not as retaliation or punishment.   Gray ex. Rel. Alexander v. Bostic,
458 F.3d 1295, 1307 (11th Cir. 2006) ("Deputy Bostic's purpose in handcuffing Gray was not to
pursue an investigation to confirm or dispel his suspicion that Grey had committed a misdemeanor.
Rather, Deputy Bostic's purpose in handcuffing Gray was simply to punish her and teach her a
lesson).  The result is the same under Florida law.  Fla. Stat. § 901.151(1).

**5.**   **Dorsett is not entitled to qualified immunity**

Because Dorsett was not engaged in the lawful execution of a legal duty at the time Kollin
was restrained, the seizure was unlawful.   Storck v. City of Coral Springs, 354 F.3d 1307 (11th Cir.
2003) (police officer who is merely on the job is not engaged in the lawful execution of a "legal
duty" for purpose of § 843.02).  As such, Dorsett violated clearly established law and is not entitled
to qualified immunity.

Alternatively, even if Dorsett was engaged in the lawful execution of a legal duty (and he was
not), Kollin never physically obstructed Dorsett. Therefore, Dorsett violated clearly established law.
Davis v. Williams, 451 F.3d 759, 765 (11th Cir. 2006) ("Florida courts have generally held, with very
limited exceptions, that physical conduct must accompany offensive words to support a conviction
under § 843.02").

The result was the same in Yessin v. City of Tampa, Fla., 2015 WL 791168 (M.D. Fla. Feb.
25, 2015) *aff'd in part, rev'd in part sub nom.*, Yessin v. City of Tampa, Florida, 613 F. App'x 906
(11th Cir. 2015) (unpublished).  In Yessin, police officers from the City of Tampa responded to
Sidebern's restaurant on December 20, 2008, in response to a physical altercation in the women's
restroom.  Id. at *1. While the officers were interviewing witnesses, attorney Brent Yessin asked the

officers about the altercation and volunteered to assist those involved.  Id.  Yessin was "instructed

. . . to 'back off' and not involve himself in the investigation."  Id.

During police interviews conducted in the restaurant parking lot, one patron was detained in

handcuffs by Officer Newberry.  Id.  Thus, Newberry was engaged in a "legal duty" for purposes of

§ 843.02.  As Newberry was interviewing a second subject, "Yessin approached, indicating that the

could provide legal services" to the person being interviewed.  Id.  That patron declined Yessin's

services, and Newberry warned Yessin not to get involved and to back up and stop interfering with

the investigation.  Id.  Yessin admitted "he was told several times to 'back off' and to not interfere."

Id.

Yessin claimed that he complied with Newberry's request, "and each time he was instructed

to 'back off' he stepped away."  Id. City of Tampa police officer Michael Leavy subsequently

directed Yessin to "leave the area" and warned he would be arrested if he refused.  Yessin refused,

and was arrested for obstruction of justice in violation of Florida Statute § 843.02.  Id. at *2.

In rejecting the officers' motions for summary judgment on the basis of qualified immunity,

the district judge concluded there was a question

> whether Yessin engaged in the requisite physical conduct–not merely verbal–to
> establish arguable probable cause to arrest under Fla. Stat. 843.02.   Namely,
> Defendant Officers argue that although not threatening to Defendant Officers, Yessin
> "physically blocked [Officer Newberry's] ability to speak with the involved parties,"
> and declined to heed the Officers' orders to "back off" and "leave the area." (record
> citation omitted).  However, Yessin contends that he complied with each instruction
> to "back off" and was far enough away from the interview that there "was no way
> [Yessin] could interfere in [Newberry's] investigation." (record citation omitted).
> Therefore, the Court finds that a dispute remains on the second element-obstruction.

Id. at *8.

On appeal, the Eleventh Circuit agreed there was a factual dispute whether Yessin physically

blocked Newberry from speaking with the parties, concluding:

> In *Davis,* this court held that, "with very limited exceptions . . . , physical conduct
> must accompany offensive words to support a conviction under 843.02." *Id*. at 765
> (citations omitted).  There is a dispute of fact as to whether the Plaintiff engaged in
> **physical** obstruction sufficient to violate this statute, or whether he was merely
> verbally disruptive.  Thus, considering the facts in the light most favorable to the
> Plaintiff, the Defendants did not have arguable probable cause and are not entitled
> to qualified immunity.

Yessin v. City of Tampa, Florida, 613 F. App'x 906, 907 (11th Cir. 2015) (bold added).

In <u>DeRosa v. Sheriff of Collier County, Florida</u>, 416 Fed.Appx. 839, 840 (11ᵗʰ Cir. 2011) (unpublished)  Kathleen DeRosa was arrested for obstruction of justice following a lawful traffic stop (i.e., the lawful execution of a "legal duty").  Kathleen DeRosa was a back seat passenger in a vehicle operated by James DeRosa.  During the traffic stop by Collier County Deputy Shaun George, "Kathleen [DeRosa] told George that he 'really need[ed] to work on [his] community service skills.'"  <u>Id</u>. at 840.

> In rejecting George's claim of qualified immunity, the Eleventh Circuit noted that
> Florida courts have long held that criticism cannot support a conviction for obstruction, even if the criticism is insulting or defiant:
>
> > "Conduct involving only verbal challenge of an officer's authority or criticism of his actions . . . operates, of course, to impair the working efficiency of government agents . . . Yet the countervailing danger that would lie in the stifling of all individual power to resist—the danger of an omnipotent, unquestionable officialdom—demands some sacrifice of efficiency."
>
> *S.D. v. State,* 627 So.2d 1261, 1262 (Fla.Dist.Ct.App.1993) (quoting *City of Houston v. Hill,* 482 U.S. 451, 464 n. 12, 107 S.Ct. 2502, 2510 n. 12, 96 L.Ed.2d 398 (1987)).

<u>DeRosa v. Sheriff of Collier County, Florida,</u> 416 Fed.Appx. at 840.

These principles apply equally to Dorsett's conduct towards Kollin.   In <u>DeRosa</u>, George argued because of the inherent dangers associated with a traffic stop, he was entitled to "maintain 'unquestioned command of the situation.'" <u>Id</u>. At 841(quoting <u>Maryland v. Wilson</u>, 117 S.Ct. 882, 886 (1997)).   The Eleventh Circuit disagreed, finding that "Kathleen's remarks were not so disruptive or alarming to warrant removing her from the vehicle to complete the traffic stop." <u>Id</u>. at 841.

The problem with Dorsett's conduct is that there was no traffic stop.  In fact, there was no "legal duty," whatsoever.  As Dorsett admitted, the matter between the two sisters was a "civil issue" and that deputies "cannot enforce civil law." **(Dorsett, p. 41).**  Thus, Dorsett was merely on the job. <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1315 (11ᵗʰ Cir. 2003).

Likewise, Wentland testified that the situation inside the apartment was a civil matter and not a criminal complaint. **(Wentland, p. 15).**  No physical or verbal threats were made by anybody inside the apartment, and it was ultimately determined that the Daryl Meyer would leave voluntarily. **(Wentland, pp. 15-16, 19).**

As the United States Supreme Court explained in <u>City of Houston v. Hill</u>,  107 S.Ct. 2502,

2510 (1987), [t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id. at 2510.  Wentland subsequently testified that he "didn't feel Mr. Kollin should be arrested."  **(Wentland, p. 72).**  He was correct.  We do not live in a police state.

At the time of Kollin's arrest, it was clearly established law that speech directed to police officers is protected under the First Amendment "against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Id. at 2009.  As such, Dorsett's punishment of Kollin's protected speech was unconstitutional, just as Deputy George's punishment of Kathleen DeRosa for her criticisms toward his community service skills violated  clearly established law.

For the foregoing reasons, Dorsett is not entitled to qualified immunity.

**WHEREFORE**, Kollin requests that the Court enter summary judgment as to Count II against Dorsett, individually (as to the lawfulness of the seizure and defense of qualified immunity, only), and enter summary judgment as to the issue of liability (not sovereign immunity or damages) on Kollin's state law claim for false arrest/false imprisonment (Counts III-IV).

**DATED** this   21st   day of February, 2017.

By:   _s/. Hugh L. Koerner_
     Hugh L. Koerner
     Florida Bar No.: 716952
     Email: hlklaw@hughkoerner.com
     Hugh L. Koerner, P.A.
     Sheridan Executive Centre
     3475 Sheridan Street, Suite 208
     Hollywood, FL 33021
     Telephone:  (954) 522-1235
     Facsimile:   (954) 522-1176
     *Attorneys for Plaintiff Gary Kollin*

## CERTIFICATE OF SERVICE
## Case No.: 15-62728-CIV-ZLOCH/HUNT

**I HEREBY CERTIFY** that this __21st__ day of February, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   *s/. Hugh L. Koerner*                                      
　　　　Hugh L. Koerner

### Service List

Hugh L. Koerner, Esq.
Florida Bar No.: 716952
Email: hlklaw@hughkoerner.com
Hugh L. Koerner, P.A.
Sheridan Executive Centre
3475 Sheridan Street, Suite 208
Hollywood, FL 33021
Telephone: (954) 522-1235
Facsimile: (954) 522-1176
*Attorneys for Plaintiff*
*Gary Kollin*

Michael R. Piper, Esq.
Florida Bar No.: 710105
Email: piper@jambg.com
Johnson, Anselmo, Murdoch, Burke, Piper
& Hochman, P.A.
2455 East Sunrise Boulevard., Suite 1000
Fort Lauderdale, Florida 33304
Telephone.: (954) 463-0100
Facsimile.: (954) 463-2444
*Attorneys for Defendants Jason Dorsett, and*
*Scott J. Israel, as Sheriff of Broward County,*
*Florida*